FILED
2013 Jan-02  PM 04:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **MIKE WINN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 1:11-CV-3574-VEH** |
| | ) | |
| **REGIONAL MEDICAL CENTER** | ) | |
| **BOARD, d/b/a Northeast Alabama** | ) | |
| **Regional Medical Center,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## MEMORANDUM OPINION

THIS CAUSE is before the court on the Defendant's Motion for Summary Judgment (the "Motion") (Doc. 16). The Plaintiff timely responded to the Motion on October 22, 2012. (Doc. 20.) The Defendant replied on October 29, 2012. The Motion is now ripe for disposition.

## I.    BACKGROUND

Defendant, Regional Medical Center Board, operates Northeast Alabama Regional Medical Center (both referred to as "RMC"), a hospital located in Anniston, Alabama. RMC's imaging department includes six modalities: radiology, CT, MRI,

nuclear medicine, ultrasound, and mammography.  (Doc. 18-5 at 4.)[1]  RMC also operates the Tyler Center, which is a separate outpatient facility near the hospital.[2] Like the hospital, the Tyler Center offers several imaging modalities, including radiology, CT, and MRI.  To operate these modalities in both the hospital and the Tyler Center, RMC maintains a staff of technicians with specialized training.  RMC also maintains a supervisor to oversee the technicians and set their work schedules.

Before January 2010, RMC had only one supervisor over the CT modality at both the hospital and the Tyler Center. (Doc. 18-5 at 4.)  Additionally, RMC had only one supervisor over the MRI modality at both the hospital and the Tyler Center.  (*Id.*) However, RMC split the supervisor responsibilities for the radiology modality between the hospital and the Tyler Center.  At the hospital, the Radiology Supervisor oversaw the radiology technicians.  At the Tyler Center, the Imaging Services Coordinator supervised the radiology technicians, but also looked after the technicians in the CT and MRI modalities.

---

[1]  A brief note about the court's citations to the record.  The Defendant filed several exhibits in support of the Motion.  The exhibits include deposition excerpts with four pages of the deposition transcript on a single page of the exhibit.  Yet, in its brief, the Defendant cites to the page number for the deposition transcript, not the page number of the exhibit.  Because there are four pages of the deposition transcript on a single page of the exhibit, a citation to the page number of the deposition transcript could be mistaken for a citation to the page of the exhibit. Thus, the court will cite the page number of the exhibit as it appears on the court's docket.

[2]  The record is not clear about the exact connection between RMC and the Tyler Center.

Before January 2010, Plaintiff Mike Winn ("Winn"), a caucasian male, worked as the Radiology Supervisor at RMC.  Winn was a working supervisor, which means he both supervised radiology technicians and filled in for them when they failed to show up for work.  (Doc. 18-5 at 7.)  Winn was fifty-eight (58) years old upon his termination.

Thomas Abernathy ("Abernathy"), a black male, worked as the Imaging Services Coordinator at the Tyler Center.  As Imaging Services Coordinator, Abernathy, like Winn, supervised radiology technicians.  But, Abernathy also assisted with supervising CT technicians and MRI technicians at the Tyler Center.  (Doc. 18-4 at 4; Doc. 18-5 at 4–5.)  Abernathy, like Winn, was a working supervisor.  Because he oversaw radiology, CT, and MRI technicians at the Tyler Center, he was licensed in all three areas.  Winn, on the other hand, was licensed only in radiology.  (Doc. 18-5 at 5.)  In January 2010, Abernathy was forty-two (42) years old.

In the fall of 2009, RMC was not performing well financially.  The Board decided to cut costs through a reduction-in-force.  David McCormick, the CEO of RMC directed Joe Weaver, the Chief Operating Officer, to identify positions to eliminate.  Weaver then met with Nick Kaufman, the Director of Imaging Services.  Kaufman suggested eliminating the Radiology Supervisor position.  (Doc. 18-5 at 4.)  Weaver ultimately adopted Kaufman's recommendation.  Of course, the parties

dispute the reason for his decision.

In January 2010, RMC implemented its reduction-in-force.  It informed Winn of its decision to eliminate his position as Radiology Supervisor.  As part of his separation, RMC offered Winn a severance package.  In exchange, RMC asked Winn to waive any and all claims he may have against it.  Under the Older Worker's Benefit Protection Act of 1990, 29 U.S.C. § 626(f), ("OWBPA"), a waiver of an ADEA claim must meet stringent statutory requirements.  In this case, it is not seriously disputed that Winn's waiver meets the statutory requirements.  (*See* Doc. 19 at 8–13.)

Nonetheless, Winn contends the release is invalid because RMC obtained it through fraud.  Several months after Winn's termination, employees at RMC told Winn that Abernathy was working in his old job.  From these reports, Winn came to believe that his position as Radiology Supervisor was not actually eliminated.  Thus, Winn contends that RMC lied to him when it asked him to sign the waiver.  Winn further contends that, had he known his position was not actually eliminated, he would not have signed the waiver.  (Doc. 19-1.)

Winn timely filed an EEOC complaint.  After he received his right to sue letter, Winn brought this lawsuit.

## II.    LEGAL STANDARD

### A.    General Summary Judgment Standard

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R .Civ. P. 56(a). "All reasonable doubts about the facts" and "all justifiable inferences" are resolved in favor of the nonmoving party. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).[3] A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A fact is material if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* The substantive law will identify which facts are material and which are irrelevant. *Id.*

The summary judgment analysis varies somewhat depending on which party bears the burden of proof at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party would bear the burden of proof on an issue, then it may meet its burden on summary judgment only by presenting positive evidence demonstrating an absence of a genuine issue of material fact—i.e., facts that would entitle it to a

---

[3] Rule 56 was amended in 2010. The Advisory Committee was careful to note, however, that "[t]he standard for granting summary judgment remains unchanged." Fed. R. Civ. P. 56 advisory committee's note to 2010 amendments. Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

directed verdict if not controverted at trial. *Id.* at 1115. Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial. *Id.*

If the nonmoving party would bear the burden of proof on an issue at trial, then the moving party can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the moving party may produce affirmative evidence negating a material fact, thereby demonstrating that the nonmoving party will be unable to prove its case at trial. *Id.* at 1116. If the moving party produces such evidence, then the nonmoving party must respond with positive evidence sufficient to defeat a motion for a directed verdict at trial. *Id.*

Second, the moving party may affirmatively show the absence of evidence in the record to support a judgment for the nonmoving party on a material element. *Id.* The moving party is not required to produce evidence negating its opponent's claim, but it must direct the court to the hole in the nonmoving party's case. *Id.* at 1115-16. If the moving party satisfies this burden, the nonmoving party may either point to evidence in the record which would sustain a judgment at trial or may come forward with additional evidence which would also sustain a judgment. *Id.* at 1116-17. The nonmoving party cannot simply rest on mere allegations; he must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358, 116 S. Ct. 2174, 2183 (1996)

6

(quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 2136–37 (1992)).

**B.    Applicable Substantive Law**

1.    <u>Fraud-in-the-Inducement</u>

An employee may waive his claims under the ADEA and Title VII.  *See, e.g.*, *Puentes v. UPS*, 86 F.3d 196, 198 (11th Cir. 1996).  Any such waiver must be "voluntary and knowing."  *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 n.15, 94 S. Ct. 1011, 1021 n.15 (1974).  In the Eleventh Circuit, a waiver is not voluntary and knowing when it is obtained by "fraud, duress, or coercion . . . ." *Griffin v. Kraft Gen. Foods, Inc.*, 62 F.3d 368, 374 (11th Cir. 1995).

In this case, Winn alleges that RMC obtained the waiver by fraud.  Winn does not identify the elements of his fraud claim, but the court assumes the elements are similar to common-law fraud.  Relevant here, common-law fraud means that one party to a contract obtained the other party's assent by making a material misrepresentation on which the other party reasonably relies.  *See, e.g.*, Restatement (Second) of Contracts § 164(1).

2.    <u>ADEA Claim</u>

The Eleventh Circuit has recently described the law governing an ADEA claim. Because this description is relevant and comprehensive, the court will quote the

Eleventh Circuit at length.

A claim of unlawful age discrimination under the ADEA may be established through direct or circumstantial evidence. *See Van Voorhis v. Hillsborough Cnty. Bd. of Cnty. Comm'rs,* 512 F.3d 1296, 1300 (11th Cir.2008). When such a claim is based on circumstantial evidence, we analyze the allocation of burdens and the presentation of proof under the framework articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Chapman,* 229 F.3d at 1024 (applying *McDonnell Douglas* to evaluate ADEA claims); *Mauter v. Hardy Corp.,* 825 F.2d 1554, 1556 (11th Cir.1987) (same).

Under *McDonnell Douglas,* a plaintiff must first establish a prima facie case of discrimination, which "in effect creates a presumption that the employer unlawfully discriminated against the employee." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To make out a prima facie case of age discrimination, the plaintiff must show four things: "(1) that she was a member of the protected group of persons between the ages of forty and seventy; (2) that she was subject to adverse employment action; (3) that a substantially younger person filled the position that she sought or from which she was discharged; and (4) that she was qualified to do the job for which she was rejected." *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1359 (11th Cir.1999).

Once the plaintiff establishes a prima facie case of age discrimination, the burden shifts to the employer to rebut the presumption of discrimination with evidence of a legitimate, nondiscriminatory reason for the adverse employment action. *See McDonnell Douglas,* 411 U.S. at 802–03, 93 S.Ct. 1817. "This burden is one of production, not persuasion . . . ." *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097. Thus, "[t]o satisfy that burden of production, '[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" *Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir.1997) (quoting *Burdine,* 450 U.S. at 254–55, 101 S.Ct. 1089). If the

employer produces evidence of a legitimate, nondiscriminatory reason for the adverse action, the plaintiff is afforded an opportunity to show that the employer's stated reason is a pretext for discrimination.  *See, e.g.*, *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097; *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817.

The plaintiff can show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089. "In other words, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs,* 106 F.3d at 1528. If a plaintiff produces sufficient evidence that the employer's proffered reason is merely pretextual, that evidence may sometimes be enough to preclude summary judgment in favor of the employer. *See Reeves,* 530 U.S. at 148, 120 S.Ct. 2097.  *See also St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.").

*Kragor v. Takeda Pharm. Am., Inc.*, --- F.3d ---, No. 11-16052,  2012 WL 6618360,

*2 (11th Cir. Dec. 20, 2012) (footnote omitted).

3.    Title VII Claim

Winn also alleges that RMC discriminated against him because of his race.

When a plaintiff's race discrimination claim relies on circumstantial evidence, a court

analyzes the claim under the burden shifting framework established in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973).  *See Combs v.*

*Plantation Patterns*, 106 F.3d 1519, 1527 (1997).  For present purposes, this burden shifting framework is identical to the framework used for Plaintiff's ADEA claim, except that the elements of a prima facie case are different.  A Plaintiff establishes a prima facie case of racial discrimination by showing:  "(1) [plaintiff] belongs to a racial minority; (2) he was subjected to [an] adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job."  *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

## III.   ANALYSIS

### A.   Winn Has Waived His Rights under the ADEA and Title VII.

It is undisputed that Winn signed a waiver purporting to release his ADEA and Title VII claims.  Additionally, it is undisputed that the waiver meets the eight special requirements for ADEA claims found in 29 U.S.C. § 626(f)(1).  (*See* Doc. 17 at 11–14; Doc. 20 at 8–13.)

Nonetheless, Winn contends the waiver is invalid because RMC obtained it by fraud.  Specifically, Winn contends RMC lied to him when it said his position was eliminated.  He asserts that RMC actually eliminated Abernathy's position as Imaging Services Coordinator and moved Abernathy to Winn's position as Radiology Supervisor.  Winn further contends that, had he known the truth, he would not have

signed the waiver.  (Doc. 19-1.)  If RMC obtained Winn's waiver by fraud, then it is

invalid.  *See Griffin*, 62 F.3d at 374.

Thus, there is no dispute that RMC told Winn it was eliminating his position.

The material fact at issue here is whether or not RMC <u>actually</u> eliminated Winn's

position as Radiology Supervisor.  Winn bears the burden of proof on his fraud claim.

The court begins by comparing the Radiology Supervisor position (Winn) with

the Imaging Services Coordinator position (Abernathy).  Winn testified that, as

Radiology Supervisor, he managed the day-to-day operations of the radiology

department at the hospital, made out schedules for the radiology technicians at the

hospital, ordered supplies, and assigned technicians to specific areas of the hospital.

(Doc. 18-1 at 9.)  Winn was responsible for the technicians' performance evaluations

and their schedules.  (*Id.*)  Winn could not hire or fire radiology technicians, though

his director often sought his input on these decisions.  (*Id.*)  Winn's technicians

worked almost exclusively in radiology, though, on rare occasions, some helped out

in CT.  (*Id.*)  Winn had no duties at the Tyler Center.  (*Id.*; Doc. 18-5 at 4–5.)

The Imaging Services Coordinator at the Tyler Center did much the same thing

as the Radiology Supervisor at the hospital.  (Doc. 18-1 at 13; Doc. 18-4 at 4; Doc.

18-5 at 5.)  However, the Imaging Services Coordinator also had responsibilities in

the CT and MRI modalities at the Tyler Center.  (Doc. 18-4 at 4; Doc. 18-5 at 5.)

RMC contends that it eliminated the Radiology Supervisor position and consolidated the duties of that position with the Imaging Services Coordinator's position.  (Doc. 17 at 5.)   Winn counters that Abernathy is in the Radiology Supervisor position.  Winn points out that Abernathy does little CT or MRI work at the Tyler Center and none at the hospital. (Doc. 20 at 3.)  Winn also contends that Abernathy does only radiology work at the hospital.  (*Id.*)  Even assuming that Winn's assertions are true, Winn must still show that Abernathy has no duties at the Tyler Center.  Winn has not made that showing.  In fact, the undisputed evidence confirms that RMC eliminated the Radiology Supervisor position.

For instance, Abernathy testified that he continued to perform his duties at the Tyler Center after January 2010.  (Doc. 18-6 at 3, 5.)  Abernathy did testify that Terry Cobb assumed responsibility for MRI at the Tyler Center after Winn's termination. (Doc. 18-6 at 4.)  However, Abernathy remained responsible for radiology and CT. (Doc. 18-6 at 4.)

Nick Kaufman testified that, while other employees assumed some of Abernathy's duties at the Tyler Center, Abernathy remained responsible for supervising the radiology employees at the Tyler Center. (Doc. 18-5 at 7–8; Doc. 19-5 at 3.) Specifically, Terry Cobb helped manage the day-to-day activities at the Tyler center in Abernathy's absence.  (Doc. 18-5 at 8.)  But, Cobb did not handle

scheduling or administrative tasks at the Tyler Center.  (*Id.*)  Abernathy remained responsible for these duties.   (*Id.*; Doc. 18-6 at 5.)

Finally, Joe Weaver testified that he eliminated the Radiology Supervisor over the Imagining Services Coordinator position because the Imagining Services Coordinator position required experience in radiology, MRI, and CT.  (Doc. 18-4 at 5–6.)  The Radiology Supervisor position, on the other hand, required experience only in radiology.  Thus, the Imaging Services Coordinator could easily assume the Radiology Supervisor's duties.  But the opposite is not also true.

To contest RMC's assertion that it eliminated the Radiology Supervisor position, Winn relies on the affidavits of three former and current hospital employees. All three employees assert that Abernathy spent the majority of his time in the radiology department at the hospital after Winn's termination in January 2010.  (Doc. 20 at 12; Doc. 19-2; Doc. 19-3; Doc. 19-4.)   All three employees assert that Abernathy does not work with CT or MRI technicians at the hospital.  (*Id.*)  And, one employee asserts that she never saw Abernathy at the Tyler Center on the days she worked there. (Doc. 19-3.)

Still, these affidavits do not create a genuine issue of fact regarding the elimination of Winn's position.  The testimony of these employees simply cannot prove that Abernathy does not continue to work at the Tyler Center.   And, if

13

Abernathy still has duties at the Tyler Center, then he is <u>not</u> in Winn's old job.  He is in a new and consolidated position.

As explained above, the Radiology Supervisor and Imaging Services Coordinator both managed radiology technicians.  One performed this job at the hospital and the other at the Tyler Center.  RMC contends that it consolidated these two positions.  If that is true, then one would expect the new position—the one currently held by Abernathy—to have many of the same duties as the former Radiology Supervisor.  But, one would also expect that the new position would have many of the duties of the old Imaging Services Coordinator.  Winn's affidavits show that Abernathy assumed many of the duties of the Radiology Supervisor.  But, they do not show that Abernathy abandoned his duties as Imaging Services Coordinator. The three employee-affiants did not follow Abernathy around all day, every day.  Nor did any of them ever supervise Abernathy.  Therefore, their observations of Abernathy's job can confirm that they observed him working in the hospital. However, simply because these employee-affiants did not observe Abernathy working in the Tyler Center does not create a genuine issue of material fact as to whether he in fact worked there, due to the limited nature of these affiants' personal knowledge. Additionally, Abernathy's physical presence at the hospital or at the Tyler Center does not establish whether or not the two positions were or were not consolidated.

Abernathy himself testified that he currently only spends about two hours a day at the Tyler Center.  (Doc. 18-6 at 4.)

RMC, on the other hand, has put forth affirmative evidence showing that Abernathy kept many of his duties at the Tyler Center in addition to assuming new duties at the hospital.  Because Winn has failed to refute this evidence, the court concludes that Abernathy is not merely doing Winn's old job.  Instead, Abernathy is in a new position, which consolidates many of the duties of the old Radiology Supervisor and the Imaging Services Coordinator.

Winn appears to argue that, because Abernathy spent most of his time at the hospital, he was actually doing Winn's job.  That is simply not the case.  The elimination of a position, by its very nature, requires the redistribution of the duties of that position to other employees.  In this case, it appears that Abernathy assumed all of Winn's duties.  But this fact does not show that RMC lied to Winn about the elimination of his position.  To establish that RMC lied to him, Winn must show that his position still exists.  If Winn's duties were consolidated with Abernathy's duties (as the record indicates), then Winn's position does not exist.

At the very least, Winn has produced no evidence sufficient to create a genuine issue of material fact regarding the elimination of his position.  Because RMC actually eliminated Winn's position, it never lied to Winn about the reasons for his

termination.  Thus, Winn's fraud claim fails.  Winn's waiver of his ADEA and Title VII claims is, therefore, valid and enforceable.  Winn's claims are due to be dismissed on that basis.

**B.    Even if Winn Has Not Waived His Rights, He Has Not Shown Pretext.**

Winn's claims fail for another reason, namely Winn has not rebutted RMC legitimate, nondiscriminatory reason for his termination.  Under both the ADEA and Title VII, an employer may assert a legitimate non-discriminatory reason for its employment decision.  *See Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).  Once the employer articulates this reason, then the employee must meet the reason head on and rebut it.  *Id.*

Assuming without deciding that Winn has a prima facie case of discrimination on his ADEA and Title VII claims, he has failed to rebut RMC legitimate reason for his termination.  RMC asserts that it terminated Winn because it eliminated his position. (Doc. 19-5 at 2–3.) As explained above, Winn has not shown that RMC did not eliminate his position.  *See* Part III.A.  Nor has he produced other evidence from which a reasonable jury could conclude that RMC's articulated reason was not the real reason.  Thus, Winn has failed to carry his burden of proof on his ADEA and Title VII claims.  Winn may quarrel with the wisdom of RMC's business decision.

But, this court is not a proper forum for that dispute. *See Chapman*, 229 F.3d at 1030.

## IV.   CONCLUSION

RMC has produced affirmative evidence showing that Winn waived his ADEA and Title VII claims.  Winn has failed to show that his waiver is invalid.  Therefore, Winn's claims are hereby **DISMISSED WITH PREJUDICE** as barred by the waiver.

Alternatively, RMC has articulated a legitimate, nondiscriminatory reason for Winn's termination.  Winn has put forth no evidence from which a reasonable jury could conclude that RMC's reason is merely a pretext for discrimination.  Therefore, there is no genuine issue of material fact and RMC is entitled to judgment as a matter of law.  Winn's claims are hereby **DISMISSED WITH PREJUDICE**.

The court does not reach RMC's argument that it is not subject to punitive damages.

**DONE** and **ORDERED** this the 2d day of January, 2013.

**VIRGINIA EMERSON HOPKINS**
United States District Judge

17